My name is Paul Turner. I'm with the Federal Public Defender Office in Las Vegas. I'm here to represent Eugene Linder this morning. This is an Alford plea case where the requirements of Alford are not even remotely met by anyone in this case, particularly by the court or counsel, frankly, for Mr. Linder. The most dramatic defect here is in the facts. Under the Alford ---- The court did apply the correct law, correct? The court did cite to Alford, Your Honor. I don't believe it ---- And apply the correct ---- well, it seemed to me they applied the law that deals with Alford. We're really talking about is there enough evidence for them to have reached their conclusion, right? True, except that they mention Alford, but they never really talk about any of the elements of Alford opinion. Alford, as Your Honor knows, requires two things, a clear desire of the defendant to plead and possibly, most importantly, a record that has a strong factual basis. This Court has held in the Avery case cited in the reply brief that what you have to have is a searching inquiry into the facts, a searching inquiry. There's not only not a searching inquiry here, there's barely any inquiry here into the facts. Let me ask you a question. In the record at the trial court or the Supreme Court, did it include the declaration of Officer Marin, M-A-R-I-N? Your Honor, I don't know if the record did in the ---- that went to the Supreme Court. Clearly, it didn't. It did in the trial court? It only ---- it wasn't at the plea canvass. It was never admitted, never talked about, never mentioned at the plea canvass. I didn't ask that. I'm not aware that it's ever ---- I suppose a public document pertinent to the case might be considered generically in the record, but I'm not aware that this document was ever presented to any court except to get the warrant. Obviously, it had to have been presented to the magistrate judge in order to get a rest warrant. So it ---- but I'm not aware that ---- I will say this. Under Nevada law, the file does come up from the lower court to the ---- to the what we call a district court in Nevada. So mechanically, that document should have gone up to the district court. It's, to my knowledge, never mentioned in anything in this case. I'm not aware of any mention of it. Counsel, though, didn't the defendant admit at the plea colloquy that he had placed his hand on the victim's throat and had crushed her carotid artery, even though he said that it was the result of the fact that she was under the influence of drugs, et cetera? Well, the only thing he said, Your Honor, he said the incident happened in my home. Okay. He said I should share responsibility. Yes. The action was motivated by fear and desperation. But I think Judge Bonita's question, too, goes to ---- I think he said that carotid artery statement at the sentencing. Yes. So then you'd have the same question as prejudice given what you just quoted plus what Judge Bonita's quoted. Yes. So where would be the prejudice if we, you know, jumped over? I think to have a voluntary guilty plea of any kind, and certainly to have an Alford plea, the key ---- the main event, so to speak, is the plea canvass. That's where the action is. That's a critically important event. And I think our Supreme Court recently in Missouri v. Fry emphasized that. I realize Fry's on a different issue. But I filed a 28J letter, and Fry makes it very clear. The plea canvass is an insurance policy for everyone, particularly the court, and for the citizens, for everyone. So we don't have excess litigation. I understand that. But what about that further statement? What is the legal effect of that? I don't think it has any legal effect with respect to a voluntary guilty plea, because I think that guilty plea had already been accepted. So it was accepted under an illegal, extra-legal basis. I don't think that can be healed by some statement later. And if you take that statement, you have to take the rest of the statements at the sentencing. And Mr. Linder made it very clear he didn't do it. He didn't do it and no, he did say he didn't do it, which obviously is consistent with Alford. But he said, I want involuntary manslaughter. I don't want a murder. I'm not, I should have been, if anything, I'd be guilty of involuntary manslaughter. But, counsel, if in fact the judge had conducted the inquiry that you wanted to at the sentencing, if in fact the defendant admitted to having crushed the victim's carotid artery at sentencing, and I misspoke. I said it was at the plea colloquy, but it was at the sentencing. Isn't that what the defendant would have said anyway at the time of the plea? So if the judge had asked him, well, tell me what you did, wouldn't the defendant have told the judge at that time at the plea colloquy that he had crushed the victim's carotid artery? I don't know, Your Honor, because he didn't have a chance. I think that's a, I don't think that's an unreasonable response to it, but I don't know. That's why, and he's entitled to a legitimate plea canvass. And he, that occurred months earlier. And the question is what would he have done at the plea canvass? I don't, you know, it's hard to backtrack and say what he would have done or not done. The key trend here, though, is that this man did not want to plead to murder on this charge. Well, just a minute. It's my understanding that the judge who has to take these pleas doesn't necessarily have to be convinced beyond a reasonable doubt that this happened. Do you agree with that? Yes. Yes. In fact, the court need only be convinced there's sufficient evidence to justify the reaching of the conclusion. Correct? Yes, but extra evidence. Okay. Just a minute.  And if that's so, when the defendant said, I realize this incident happened in my house, I should share responsibility, isn't that enough? He admits that he covered up Ives' mouth and put pressure on her face and neck. He never denies killing Ives. And he says, I understand that by pleading guilty, I admit the facts which support all the elements of the offenses to which I now plead. And one of those facts which submit the elements in the agreement was that he knowingly and feloniously, without authority of the law, killed Ives. Yes. That is not a fact, though. That's a conclusion of law, obviously. That's not a fact. The declaration, I mean, the information has no facts in it. It has a conclusion of law in it. But he says, I admit to everything that's in Exhibit 1, and Exhibit 1 says that he killed her by strangulating and or choking. Yes. Right. So that is fairly specific as to, you know, you don't even need whether he did it through the carotid artery or otherwise. He strangled or choked this person. Yes, Your Honor. Could I speak to that? I'm wondering why the judge can't rely on that. Your Honor. Along with his testimony about I was there. If you run strangulation and manslaughter through Westlaw or Lexis, you get about 25 pages of cases, 20 pages of cases holding that a strangulation situation could be manslaughter. So strangulation doesn't mean murder. Strangulation can be manslaughter, it could be murder, it could be a lot of things. The problem here is that no one explained to this man what the elements of these different crimes were. That's the real problem. That's one of the big problems here. In Boykin, which is certainly still applicable in Alford, it's cited in Alford, you have to show the defendant, you have to make sure the defendant understands the law in relation to the facts. We don't have any understanding here because there's no explanation here. There's nothing here. Counsel, wasn't that in the plea agreement? No. Well, no, Your Honor. Two things about that. The plea agreement is a standard stock Nevada plea agreement. Okay. It's not an Alford agreement. Somebody scribbled by Alford on there. I'm guessing the judge. I have no idea, actually. It would seem logical to the judge. The plea agreement does not have any facts in it, to my knowledge. The plea agreement is a boilerplate statutory document that we could all get out of Nevada reports any time we want to look at it. It doesn't help a whole lot. It says it goes to the exhibit. They tell you to go to Exhibit 1, and that's what I was reading from. My question is this. It seemed to me that it was pretty clear from the colloquy, you know, call it Alford, call it what you want, that there were kind of two things. One, he thought there was, you know, there was this argument, he wanted it to be known that this didn't just come out of the blue. And he definitely wanted to get the benefit of some deal because he did understand that if he went to trial, he would be facing a longer automatic sentence. And he kind of makes that clear. That's why I thought it was pretty clear from the back and forth that, you know, he doesn't need to be a lawyer and understand Alford to say that's why I'm doing this, so call it what you will. He articulated why he was doing it, didn't he? Well, he articulated a mistaken understanding that his lawyer apparently had told him that Alford is different from a guilty plea. It's different, sure, in a sense, but it's a finding of guilt. And also he thought Alford carried a lesser sentence, like it was a different type of crime almost. That obviously is not true. Well, I thought that he was saying, like, I thought if I just plead guilty straight up or go to trial, I might get this bigger 20-year automatic, and he might be mistaken in the law, but the reason he was doing this is he wanted to get that smaller base, I thought. Do you agree that that's what he was aiming to? I don't see the red lights on, but if I'm not wrong. Please, you can go ahead and answer. Yes. I think he may have, he thought it wasn't a life sentence. I think that's what the record really shows. Okay. Yeah, just one point I'd make. In Nevada, the reality of sentencing in Nevada, and I know a little bit about it because I represent a lot of people, is that a life sentence is pretty darn close to a life sentence. Parole is not handed out very. So whether it's 10 to life, 20 to life, 50 to life, 5 to life, you get a life sentence. Life sentence is life. For most of my clients, I can certainly represent it as an officer in this Court to you, that that's true of most of my clients. And I'm talking about 50, 75, 100 people, ma'am. Thank you. May it please the Court. My name is Tom Gover. I'm from the Nevada Attorney General's Office. I represent the warden in this case. I'd like to respectfully correct my colleague initially when he first approached the Court and said that this is an Alford case. This is not an Alford case. This is a State habeas case. This is a case where we've already had a Nevada Supreme Court apply Federal law as determined by the United States Supreme Court. And the distinction that I would like to make is that we're not arguing Alford de novo, but we're looking at it through the deferential lens of AEDPA and that the Nevada Supreme Court's decisions in these cases were not objectively unreasonable. We have two issues that were certified for appeal, one dealing with the  proceeding, and we also have the ineffective assistance of counsel claim related to advice to lender to entering into this plea. In both cases, the Nevada Supreme Court appropriately articulated the correct Federal law in the challenge to the plea. The Court cited some Blackledge-esque type Nevada case law, but it's Nevada case law that applies the standard that says that we presume the veracity of the plea proceedings, and that solemn declarations made in open court to such plea proceedings are deemed to be correct, and appropriately placed the burden on Eugene Linder to show that his statements at the plea proceeding, that he's voluntarily entering into these plea into this plea agreement, that he wants to do a 10-to-life as opposed to a 20-to-life, all these things, that those things were true, and that his assertions now, he has an uphill battle based on the standard. Based on the Nevada proceedings plus Alford, would you agree that the sentencing statements would not be part of that evaluation? The sentencing statements. Statements made at sentencing as opposed to at the plea. No. I think the statements made at sentencing help us understand or solve the concern in Alford where we are looking at a factual basis, and that, you know, there's two reasons for the factual basis. One is to, it colors this man's knowing and voluntary nature of entering into his plea, but there's also a standard or a reason for a factual basis is to protect the innocent. And from the standpoint of do we, are we concerned about an innocent man being in a Nevada prison right now being Eugene Linder, we have a very good record to show that there is no way that he's an innocent man. He admits to being the person that caused Ms. Ivey's death. He, in his, actually his sentencing statement, he relates the quite, you know, remarkable story about he was just trying to cover up her mouth to keep her from talking so he could talk, you know, he wasn't going to talk over her voice. She was so loud. Next thing you know, she's, you know, he accidentally presses a carotid artery and she's dead. And so, you know, the story is somewhat remarkable, but it isn't a protestation of innocence that we would typically see in an Alford type case. He's not saying I didn't kill her. He's hymning and humming about his level of culpability. Do we review the terms of the plea agreement because of the conclusory nature thereof to really determine the first prong, which is whether, in fact, there's enough factual determination here to make this determination? I think the plea agreement was relied upon by the Nevada Supreme Court. In their opinion, they actually referenced the fact of the plea agreement. What it seems to me your opposition is suggesting is that the plea agreement by its terms is mere conclusionary, that it's not really factual, that it's conclusionary in its determination and therefore not really appropriate for us to review in determining whether or not there are really factual, actually enough facts to make this happen. You know, I would agree with that if there was no plea canvas. But the reason why we have a plea canvas is we put the defendant in open court and make him enter his solemn declarations that he read that plea agreement, that he's adopted the – that he understands that plea agreement, that he agrees with that plea agreement, and all the waiver of rights and the consequences of the plea that are listed out in that plea agreement. Well, but the waiver of rights and the consequence might go to the expressed desire to plead. But I'm still having – I'm wanting you to think back about the strong factual basis. Because in this particular instance, the strong factual basis of that plea is pretty sketchy, wouldn't you agree? If we take out the plea agreement? No. Because we had the actual factual basis stated in open court. It was a deputy DA who was obviously covering a stacked calendar and was not the deputy DA who brokered the plea. But nevertheless, in the – during the initial arraignment or during the arraignment, she put forth a factual basis that covered all of the elements. So the fact that she said on September 7, 1997, D was dating or living with Ives, the victim in the case, the two got in a disagreement whereupon D strangled her, whereupon she died, nobody says anything else, that's enough? That covers all the elements of murder, Your Honor. If you look at the information that's attached to the plea agreement, that's sufficient to put a person on notice as to what the charges are and what all the elements of murder are. You know, during that plea colloquy, we also had counsel and also in the plea agreement verify that they went over all of these elements. You know, the record really shows that. The defendant nor has counsel ever admitted all of that. The only thing they said is the incident happened in my home and I should share the responsibility, didn't I? Well, at the plea proceeding, when Linder was still what I view as trying to negotiate a better deal, I mean, he'd much rather take second-degree murder than first-degree murder, but if he can get involuntary manslaughter, hey, let's go for it. During the initial plea proceeding when he makes that request, Norman Reed, his defense counsel, chimed in that he had explained all of this to his client and that, you know, he would not be able to get involuntary manslaughter. He tried that again at sentencing. After he remarked his story about, you know, Miss Ives is a mob boss daughter and he tried to cover her mouth, on page 47 of the record, Norman Reed, who was defense counsel for Mr. Linder, expressly told the judge, Judge, I spent several hours discussing these issues with Mr. Linder and explaining how everything that he says still holds him criminally responsible for what we could have been, what could have been a first-degree murder case. And so, you know, there is a strong factual basis. We have a record. But we really don't need a strong factual basis that we would determine it. It's we give discretion to the Nevada court to determine it. That seemed to be your argument. Of course. I mean, and, of course, that deferential lens is always a quiver or an arrow in my quiver as the State. But what I would suggest, again, in closing, is that, number one, we have the deferential standard that we're dealing with. We have the factual basis that was done at the plea proceeding that I think is sufficient for purposes of coloring Linder's knowing voluntarily and intelligent entry into his plea. And then we have all the statements throughout the record that shows we definitely do not have an innocent man in prison. To answer one of the questions that was asked about the declaration of arrest, whether or not that survives and makes its way to the district court, that comes to the district court by way of what's called the justice court bind-over packet. And so that would be something that the judge would have had available to her at the time that she is evaluating the strong factual basis of the entry of this plea. And she definitely would have known all the things that were put forth in that declaration of arrest that was also cited in my briefing. Thank you. You've exceeded your time, but I'll give you a minute, Mr. Turner, for some rebuttal. Thank you. I don't think saying someone strangled and died is enough at all, because as I said, there are any number of cases for voluntary manslaughter, involuntary manslaughter involving strangling people. A typical one would be where you commit a battery and then inadvertently someone dies. That's manslaughter. That's not murder. Obviously, some of these things are debatable. I don't question that. But Mr. Linder was entitled to take to stand his ground on manslaughter if that's what he wanted to do. There's good basis for that. Counsel, can I ask you a question? At the time of the plea, Mr. Linder himself asked the court whether or not the court would rescind the charge down to involuntary. I assume that means involuntary manslaughter. So he obviously knew at that time what manslaughter was, right? I mean, he asked the question, he asked the judge to reduce the charge down to involuntary manslaughter. And the judge said, no, I can't do that. Doesn't that sort of – doesn't that indicate to you that the judge obviously knew that this was not a case for voluntary manslaughter or involuntary manslaughter? Your Honor, well, what it suggests to me is that the judge knew what she was supposed to do and explained to Mr. Linder the differences between these crimes and answered his question in a proper, appropriate way under Alford. That's what she should have done. She may have assumed a lot of things, but with all due respect, I don't think she did the right thing here under Alford. And if I might add one thing. I'm sorry, Your Honor. No, that's okay. Go ahead. I don't want to fail to answer your question. No, no, that's okay. Go ahead. I think there's a serious policy issue here. What the State, in essence, is asking you to do and asking this Court to do is reconstruct things after the fact so that we all feel comfortable. In other words, the canvas may be a semi-joke, as this one is, but if we can somehow piece it together, we're going to be okay. I just submit that's not right. That's not the law. That's not Boykin. That's not Alford. That's not any of the cases from the Supreme Court. And like I said, in Missouri v. Frye a few weeks ago, the Court made it very clear how important a plea canvas is. And that's really important, I think. Thank you. Thank you very much. I'd like to thank both of you for your argument this morning. The case of Linder v. Donat is submitted.
judges: Benitez, McKeown, Smith